UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WALTER E. BEAVER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02784-SEB-MJD |
| | ) | |
| UNITED STATES POSTAL SERVICE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now before the Court is Defendants' Motion for Summary Judgment [Dkt. 49].

Plaintiff Walter E. Beaver, Jr. brings this action against his employer, the United States

Postal Service ("USPS") and individual defendants Jeffrey S. Leffler and Pamela S.

Parrish, alleging that Defendants violated his rights under the Family and Medical Leave

Act of 1993, 29 U.S.C. § 2615, *et seq.* ("FMLA") by retaliating against him after he took

FMLA leave.  For the reasons detailed below, we <u>GRANT</u> Defendants' Motion for

Summary Judgment.

**<u>Factual Background</u>**[1]

_____

[1] On December 14, 2021, Mr. Beaver filed a Motion for Leave to Designate Previously
Unavailable Evidence in Opposition to Summary Judgment [Dkt. 62] and Motion to
Amend/Correct Exhibit List [Dkt. 63], seeking to add to the summary judgment record and his
final exhibit list an unsworn written statement, not signed under penalty of perjury, from Mr.
Williams and an accompanying affidavit from Mr. Beaver purporting to authenticate Mr.
Williams's statement.  However, despite Mr. Beaver's admitted awareness that Mr. Williams
likely had information relevant to his claims in this lawsuit, Mr. Beaver took no steps to obtain
that information until long after discovery had closed, and Defendants' summary judgment
motion was fully briefed.  Because Mr. Beaver has not established that his failure to obtain an
affidavit or testimony from Mr. Williams in a timely manner "was substantially justified or is
harmless" as required by Federal Rule of Civil Procedure 37(c)(1), coupled with the fact that Mr.

Mr. Beaver began working full-time for the USPS in 1989 as a clerk.  During his long tenure with the USPS, he has held a variety of positions, but at all times relevant to this lawsuit, Mr. Beaver was employed by the USPS as a Labor Relations Specialist (EAS-19), with a duty station at the Indiana District Office located on Vincennes Road in Indianapolis, Indiana (the "District Office).  Mr. Beaver is currently employed by the USPS as an Occupational Health Processing Specialist (EAS-17), with a duty station at the District Office.

**Plaintiff's Job Duties and Performance**

As a Labor Relations Specialist, Mr. Beaver's duties included conducting meetings on employee grievances, writing employee disciplinary actions, and arbitrating grievances.  In that role, Mr. Beaver was directly supervised from October 2018 through January 31, 2019 by Defendant Pamela Parrish, who served as the Acting Manager of Labor Relations at the District Office during that time period, and thereafter by Timothy Williams, who took over as Labor Relations Manager after Ms. Parrish left.  Ms. Parrish, in turn, reported directly to the Manager of Human Resources Defendant Jeffrey Leffler. As Human Resources Manager, Mr. Leffler directly supervised several department managers, including Ms. Parrish, but did not directly supervise Mr. Beaver.  Neither Ms. Parrish nor Mr. Leffler had any role in receiving, reviewing, evaluating, or deciding employee requests for FMLA leave.

---

Williams's statement is neither an affidavit nor a declaration as required by Federal Rule of Civil Procedure 56(c)(4), and, even if considered, would not create a genuine issue of material fact, we <u>DENY</u> Plaintiff's motions.

During the time that Ms. Parrish managed Mr. Beaver, both she and Mr. Leffler received complaints from the field that Mr. Beaver was settling cases on terms overly favorable to employees and taking too long to issue employee discipline.  An unnamed Labor Relations Specialist also complained to Ms. Parrish and Mr. Leffler that Mr. Beaver's workload was unfairly light, causing the other Labor Relations Specialists to be overworked.  To our knowledge, Mr. Beaver was not disciplined based on any of these complaints, however.

**Defendant's Procedures Regarding FMLA Leave**

USPS employees may initiate a request for FMLA coverage in one of three ways: by submitting a request to their supervisors, which is then forwarded to the Human Resources Shared Service Center ("HRSCC") in Greensboro, North Carolina, where a postal service FMLA specialist determines whether the postal employee qualifies for FMLA and renders an initial FMLA coverage determination; by submitting their FMLA requests directly to HRSSC; or by calling into the Integrated Voice Response ("IVR") system with their requests.  USPS employees can also choose to "pay for" their FMLA leave in one of three ways: as annual leave, sick leave, or leave without pay.  To charge FMLA leave as sick leave, an employee must submit to the appropriate supervisor in advance of leave a PS Form 3971 and supporting documentation that sufficiently explains the illness or injury and demonstrates that the employee will be unable to perform their usual duties during the lave period.  If an employee requests sick leave but does not provide the required supporting medical documentation, the leave may be charged as annual leave or leave without pay.

**Plaintiff's FMLA Leave Request**

In the fall of 2018, Mr. Beaver began having a serious health issue involving his blood pressure. Although he was advised at that time to take time off from work, he did not do so. After a follow-up medical appointment on December 13, 2018, however, Mr. Beaver followed advice from his doctor that he take a two-week leave from work and applied for FMLA leave in order to address his blood pressure issues as well as treat his nerves, stress, and anxiety. Mr. Beaver submitted his request for FMLA leave and accompanying medical documentation to Mr. Leffler that same day. According to Mr. Beaver, Mr. Leffler responded in a loud, derogatory manner, stating, "This doesn't have your diagnosis. I need to know what's wrong with you." Beaver Dep. at 60. Mr. Beaver told Mr. Leffler that he was not entitled to a diagnosis and that Mr. Beaver would submit his FMLA paperwork to the HRSSC, who would determine whether to approve the FMLA leave request. Mr. Leffler again raised his voice and repeated, "I need to know what's wrong with you." *Id.* at 60–61. Mr. Beaver reiterated that he would submit the FMLA paperwork and inform Mr. Leffler of the results. *Id.* at 61. Mr. Leffler denies asking Mr. Beaver to disclose his health information.

Mr. Beaver's FMLA request was granted[2] and he took approved medical leave under the FMLA from December 17, 2018 through January 1, 2019. At Mr. Beaver's request, that leave was charged as sick leave and he was therefore paid for the time he was off work.

---

[2] While employed with the USPS, Mr. Beaver had requested FMLA leave on three or four occasions prior to his December 13, 2018 request, and each time his leave request was approved.

**Plaintiff's Reprimand Upon Return From FMLA Leave**

On January 2, 2019, Mr. Beaver's first day back to work following medical leave, he was called into an impromptu closed-door meeting with Ms. Parrish and Mr. Leffler that lasted approximately ten minutes.  During this meeting, Ms. Parrish and Mr. Leffler accused Mr. Beaver of poor work performance, to which Mr. Beaver responded, "This is unfair."  Parrish Dep. at 59.  Mr. Beaver testified that he was also reprimanded by Mr. Leffler for taking FMLA leave.  Specifically, Mr. Leffler told Mr. Beaver that his coworkers had to pick up his slack while he was gone and stated, "I hope you're happy.  While you were gone, I couldn't give anybody else time off work.  We're not going to lighten your workload just because you took family medical leave.  You're expected to perform all your duties."  Beaver Dep. at 64.  According to Mr. Beaver, Mr. Leffler said this in a loud voice with a condescending tone.  *Id.* at 64–65.  Mr. Beaver knew of other USPS employees, including a coworker, Greg Shearer, who had taken FMLA leave but were not subjected to similar treatment upon their return.

As Mr. Beaver and Ms. Parrish were leaving Mr. Leffler's office following the January 2 meeting, their coworker Brian Hise was walking through the hallway.  Ms. Parrish asked Mr. Hise to join her in the smoking area, and, on the way, told him, "We should not have done that."  Hise Dep. at 57.  Mr. Hise asked Ms. Parrish what she meant, and she informed him that she and Mr. Leffler had just reprimanded Mr. Beaver for taking FMLA leave.  Mr. Hise testified that Ms. Parrish then stated it "was wrong and probabl[y] against the law, but he deserved it."  Exh. 11 to *id.*  Mr. Hise told Ms. Parrish,

"That was bullshit."  Hise Dep. at 62.  Ms. Parrish denies discussing Mr. Beaver's FMLA leave with Mr. Hise.

A few minutes after Ms. Parrish and Mr. Hise went out to the smoking area, Mr. Leffler joined them, and, according to Mr. Hise, stated that he was not able to let anyone off during the holidays because Mr. Beaver took leave and that Mr. Beaver "dumped on his co-workers."  Wise Dep. at 64; Exh. 11 to Wise Dep.  Mr. Leffler denies reprimanding Mr. Beaver or speaking with Mr. Wise about such reprimand.  Leffler Dep. at 59–60, 101.

### Plaintiff's Office Relocation

Labor Relations employees in the District Office work in an L-shaped hallway space that houses nine offices arranged as follows: one large corner office with two more offices along the first wall, all of which face to the outside; four offices around the corner, also facing the exterior of the building; and two offices located on the interior walls of the hallway.  The interior offices do not have windows and are smaller than those on the exterior side of the building (*e.g.*, approximately ten feet by twelve feet versus eight feet by eight feet).  When Mr. Beaver took FMLA leave in December 2018, Mr. Leffler occupied the large corner office, Ms. Parrish worked in the office next to Mr. Leffler, and Mr. Beaver occupied the office next to Ms. Parrish, where, when he had first moved into the Labor Relations Specialist position, he had "set up shop" because it had been vacant at the time.  Beaver Dep. at 74, 75–76, 77.

According to Mr. Leffler, at some point in late 2018, he decided that Mr. Beaver, who was struggling to complete his work tasks in a timely manner, would perform better

if his workspace were relocated to an office closer to the other Labor Relations Specialists and away from the busy entrance area where there were numerous visitors and other interruptions.  Mr. Leffler testified that he wanted to stop visitors from proceeding directly to Mr. Beaver's office based solely on its location near the entrance and steer walk-in traffic instead to the Labor Relations Manager so that tasks could be delegated from that level down to the appropriate Labor Relations Specialist.  Mr. Hise testified that Mr. Leffler either told him or he had overheard Mr. Leffler say that he (Mr. Leffler) "did not want to have people come into the labor department and the first person they see is Mr. Beaver."  Hise Dep. at 86.  Mr. Leffler testified that he also sought to relocate Mr. Beaver in order to accommodate another staff member, the Attendance Control Officer ("ACO"), who, unlike Mr. Beaver, reported directly to Mr. Leffler.  Mr. Beaver was not informed of this change prior to his taking FMLA leave, however.

On January 7, 2019, five days after Mr. Beaver returned from FMLA leave on January 2, he was asked to move into one of the two interior offices, which was the only other available office in the Labor Relations hallway at that time.  Mr. Beaver was told that he needed to vacate his office for an ACO who would be arriving the next week, but the ACO did not arrive until May or June.  Mr. Beaver did not indicate to his supervisors that he was upset by the relocation, nor did he request to be moved somewhere other than the interior office, believing that such a request would have been "rude."  Beaver Dep. at 78–79.  Although Mr. Beaver was able to perform the duties of his position in the interior office, as it contained a computer workstation and office supplies, he reportedly found the new "broom closet" office "embarrassing," like he was "in a doghouse" or "a timeout

room" given that other labor representatives had larger offices with windows.  Beaver

Dep. at 76, 79, 190–92.  Mr. Beaver was required to remove storage boxes from the

interior office before moving in, and there was room for only one guest chair, not two,

which were sometimes necessary for his appointments.

**Plaintiff's Investigative Interview**

On January 31, 2019, which was Ms. Parrish's last day as Acting Labor Relations

Manager, she conducted an interview with Mr. Beaver to investigate whether he had lied

to her about performing a task that had not been assigned to him prior to going on FMLA

leave.  According to Mr. Beaver, however, the task had been performed while he was out

on FMLA leave; thus, Ms. Parrish would have known that he could not have done what

she was accusing him of having done in the interview.  Mr. Leffler was not involved in

the interview and Mr. Beaver's FMLA leave was never discussed at any point during the

interview.  Although Ms. Parrish recommended that Mr. Beaver be disciplined for the

incident, Mr. Leffler did not take any disciplinary action against him.

**Plaintiff's Temporary Work Assignments**

It is within the scope of the assigned duties of a Labor Relations Specialist to be

detailed to perform temporary work details in other USPS facilities as necessary.  On

February 1, 2019, Mr. Beaver was given such an assignment; he was assigned to travel to

a USPS facility in Gary, Indiana, in order to address attendance problems at the Gary

plant.  This assignment lasted four days, from February 5, 2019 through February 8,

2019, and Mr. Beaver traveled by USPS vehicle with a gas card, stayed in a hotel, and

received a per diem to cover his expenses.  Mr. Beaver claims that it was Mr. Leffler who

made this assignment, though Mr. Leffler has testified it was Ms. Parrish's successor, Mr.

Williams, who assigned Mr. Beaver to travel on this occasion.  In any event, neither Mr.

Leffler nor Mr. Williams inquired of Mr. Beaver whether he had the requisite knowledge,

skill, or experience for the assignment before sending him to the Gary plant to deal with

the assigned task.

Although Mr. Beaver was not financially burdened by the temporary assignment

to Gary, he had other work he had been assigned at the time, requiring him to "hurry up"

to complete it in order to travel on only four days' notice.  Beaver Dep. at 97.  He also

lost his personal time, and, because he had not been trained on attendance control

practices or procedures, he failed to accomplish the task he had been sent to the Gary

plant to accomplish.  Mr. Beaver testified that in his view other Labor Relations

Specialists who were trained in the specific duties assigned to him and who had

volunteered to travel should have been selected as he did not volunteer and was not

appropriately trained.  However, Mr. Beaver never expressed any of these concerns

regarding lack of training or workflow to Mr. Leffler when he was given the assignment.

Mr. Beaver also acknowledged that of the five remaining Labor Relations Specialists

who could have been assigned the travel, two were single parents, two others had

upcoming arbitrations, and the status of the remaining Labor Relations Specialist was

only in an acting capacity in that position.

Approximately one month later, on March 18, 2019, Mr. Williams assigned Mr.

Beaver to the USPS plant in downtown Indianapolis for a three-week period to assist with

attendance control on all three shifts.  During this assignment, Mr. Beaver remained in

his own home each night, but had a longer commute to work (*i.e.*, 20 extra miles per day). Mr. Beaver could have driven a USPS vehicle to the plant each day but chose instead to drive his own car. Mr. Beaver requested compensation for his additional mileage, but when that request was not addressed by the USPS, he abandoned the request.

On April 8, 2019, Mr. Leffler summoned Mr. Beaver back to the District Office from the Indianapolis assignment, who along with Mr. Williams conducted a meeting with Mr. Beaver to convey their dissatisfaction with Mr. Beaver's performance in Indianapolis. Mr. Beaver for the first time disclosed to Mr. Leffler in response that he had never been trained in attendance control. Mr. Beaver explained his failure to inform Mr. Leffler previously of his lack of training because he believed that Mr. Leffler was already aware of this fact. Mr. Beaver received no formal discipline as a result of this meeting with Mr. Leffler and Mr. Williams.

**Plaintiff Accepts New Position Within USPS**

In November 2019, Mr. Williams approached Mr. Beaver, saying, "I heard you want out of Labor Relations. I can make that happen." Beaver Dep. at 51; Beaver Aff. ¶¶ 3–4. Mr. Williams proceeded to inform Mr. Beaver of an EAS-16 position (later reclassified as EAS-17) that had opened as a Health and Resource Management Specialist. According to Mr. Beaver, he had never informed anyone of a desire to leave Labor Relations. Mr. Beaver believes it was Mr. Leffler who had told Mr. Williams to offer him the Health and Resource Management Specialist position to push him out of the Labor Relations department while creating the appearance that it was his own choice to

10

leave.  Mr. Beaver replied to Mr. Williams, saying, "Let me think about it.  Can I let you know tomorrow?"  Beaver Dep. at 51.  Later that afternoon, Mr. Beaver emailed Mr. Williams, to thank Mr. Williams for the job offer and tell him that he was "90% on accepting [it]."  Dkt. 49-6.  The next morning, Mr. Beaver did, indeed, accept, the Health and Management position via email.  Mr. Beaver was under no obligation to accept the job offer and could have declined it, thereby remaining in his Labor Relations Specialist role.

Mr. Beaver's Labor Relations position was an EAS-19 position; to be considered for the Health and Resource opening, he had to submit a non-competitive downgrade request to that department's manager, who was a direct report of Mr. Leffler.  Mr. Beaver testified that, although the job had been open for six months and the manager had already chosen another employee for the position, Mr. Leffler rejected the other candidate and suspended further interviews until headquarters had approved Mr. Beaver for the position.

According to Mr. Beaver, his acceptance of the Health and Resource Management Specialist position was made under duress, given his preference for remaining as a Labor Relations Specialist.  He felt he had been subjected to humiliating changes in his work environment since returning from FMLA leave which negatively impacted his self-respect and caused him to lose sleep and feel unlike himself.  He believed no reasonable person would want to work in the conditions to which he was subjected.  Mr. Beaver did view it as a benefit of accepting the new position, however, that he no longer had to work in the same area as Mr. Leffler.

Despite Mr. Beaver's move from an EAS-19 to an EAS-16 position, his salary remained the same.  He subsequently received performance increases in his salary in January 2020 and again in January 2021.  Mr. Beaver received another increase in salary in May 2021 when his position as a Health and Resource Management Specialist was reclassified from EAS-16 to an EAS-17 Occupational Health Processing Specialist position.  He would not have received these salary increase had he remained in Labor Relations.  However, the maximum salary Mr. Beaver can attain in the EAS-17 position is $11,000 less than the maximum salary he could potentially have attained had he remained in his EAS-19 Labor Relations Specialist position.

**Plaintiff Is Issued a Letter of Warning**

On December 13, 2019, which was Mr. Beaver's final day in the Labor Relations department, Mr. Williams issued a Letter of Warning, stating that, after accepting his new position as a Health and Resource Management Specialist, Mr. Beaver had failed to complete work that he had been assigned prior to his departure from the Labor Relations section.  Mr. Beaver did not appeal the Letter of Warning he had received and the fact of the issuance of the letter does not appear in his personnel file.  Mr. Beaver was not disciplined in any manner as a result of the Letter of Warning.

**Plaintiff Files Equal Employment Opportunity Complaint**

On August 2, 2019, Mr. Beaver submitted an Equal Employment Opportunity ("EEO") complaint to the USPS alleging that he was experiencing discriminatory harassment based on his race, national origin, religion, sex, age, physical disability as well as retaliation for taking FMLA leave and filing an EEO complaint.  In his complaint,

Mr. Beaver raised thirteen issues, including the December 13, 2018 conversation with

Mr. Leffler, the January 2, 2019 meeting with Mr. Leffler and Ms. Parrish, the office

move, his temporary work assignments, and the December 2019 Letter of Warning.  Mr.

Beaver later submitted additional claims to his EEO complaint, but, to our knowledge,

Mr. Beaver never included his acceptance of the Health and Resource Management

Specialist position as a basis for his EEO complaint.  On June 17, 2020, Mr. Beaver's

EEO case was closed with a finding of no discrimination.

**The Instant Litigation**

Mr. Beaver filed this lawsuit on October 28, 2020, asserting FMLA claims

pursuant to 29 U.S.C. § 2615(a) against the USPS and against Mr. Leffler and Ms.

Parrish in their official and individual capacities as well as Indiana state law claims of

interference with a contractual relationship against Mr. Leffler and Mrs. Parrish.  The

Court has dismissed Mr. Beaver's official capacity and state law claims against Mr.

Leffler and Ms. Parrish.  Defendants now move for summary judgment on Mr. Beaver's

remaining FMLA retaliation claim against the USPS and Mr. Leffler and Ms. Parrish in

their individual capacities.

**Plaintiff Declines Offer to Return to Prior Position**

In August 2021, Mr. Beaver applied for and was offered an open position as a

EAS-19 Labor Relations Specialist but ultimately refused the offer.  Mr. Beaver testified

that he rejected the offer to return to Labor Relations because he would be supervised by

Cathy Brown, who, he recalled, had a close working relationship with Mr. Leffler and

who had been excessively praised by Ms. Parrish.  Ms. Parrish at that time was no longer

working in Labor Relations but worked in the District Office two to three days per week.

Mr. Beaver had determined that, contrary to rumor that Mr. Leffler was leaving the

USPS, he would soon be returning from medical leave and would return to the Labor

Relations department.  Mr. Beaver was concerned that Ms. Brown would be influenced

by Mr. Leffler and/or Ms. Parrish and, based on these considerations, chose not to accept

the open position in Labor Relations.  According to Mr. Beaver, if Mr. Leffler had not

returned to the USPS, he would have accepted the job.

<u>**Legal Analysis**</u>

**I.       Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine disputes of material

fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for

summary judgment if it appears that no reasonable trier of fact could find in favor of the

nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate

the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences

flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*,

573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

**II.      Discussion**

Mr. Beaver claims that Defendants retaliated against him for taking FMLA leave

in December 2018.  "Employers are … prohibited from retaliating against an employee

[who] exercises or attempts to exercise FMLA rights."  *Pagel v. TIN Inc.*, 695 F.3d 622,

14

631 (7th Cir. 2012); *see also* 29 U.S.C. § 2615(a)(1).  This means that employers "cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions." *Pagel*, 695 F.3d at 631.  To establish a claim for FMLA retaliation, a plaintiff must prove that he (1) engaged in statutorily protected activity; (2) was subjected to an adverse employment action; and (3) the protected activity caused the adverse employment action.  *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018) (citation omitted).  FMLA retaliation claims are evaluated "the same way that we would evaluate a claim of retaliation under other employment statutes." *Pagel*, 695 F.3d at 631 (quotation marks and citation omitted).  Accordingly, the dispositive inquiry is whether the evidence as a whole would permit a reasonable factfinder to conclude that the plaintiff's protected activity caused the adverse action.  *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

The Seventh Circuit has "consistently required that the adverse action giving rise to an FMLA retaliation claim be 'materially adverse.'" *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (collecting cases).  Adverse actions for retaliation purposes "are not limited to employment-related activities but include any actions that would dissuade a reasonable employee from exercising his rights under the FMLA." *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008).  In the retaliation context, "it is important to separate significant from trivial harms." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (Title VII case).  In other words, the decision to take FMLA leave, "cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

15

Mr. Beaver contends that immediately upon his return from FMLA leave, Defendants began retaliating against him.  Specifically, he claims that the day he returned to the USPS from leave, on January 2, 2019, Mr. Leffler and Ms. Parrish verbally reprimanded him for poor work performance and told him that because he had taken leave, they had been unable to allow any of his coworkers to take time off over the holidays.  Approximately one week later, on January 7, 2019, Mr. Leffler moved Mr. Beaver from the large, windowed office he had been occupying up to that point, to a smaller, windowless office.  This move was ostensibly because a new member of management needed the larger office, but that individual did not arrive until a few months later.  Mr. Beaver claims that a few weeks after his office was moved, on January 31, 2019, Ms. Parrish subjected him to an investigatory interview for reasons she knew were meritless in continued retaliation for his having taken FMLA leave.  He was then chosen for a four-day temporary work assignment in Gary, Indiana, which lasted from February 5, 2019 through February 8, 2019.  A little over a month later, Mr. Beaver was given another temporary work assignment, this time in downtown Indianapolis, which lasted from March 18, 2019 to April 7, 2019.  That assignment required him to work the night shift and lengthened his daily commute by twenty miles.  According to Mr. Beaver, he was singled out for these assignments despite having no training in the work he was expected to perform, namely, attendance control practices and procedures, and then reprimanded upon his return from the second temporary assignment for his poor performance, all in retaliation for his December 2018 FMLA leave.

Even assuming that a genuine issue of material fact exists as to whether these various slights, either individually or aggregated, constitute unlawful retaliation in violation of the FMLA, summary judgment in Defendants' favor is still warranted here because the record does not support a claim for damages or equitable relief as a result of these claimed retaliatory actions.  An employer who violates the FMLA is liable for compensatory damages equal to the amount of "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation."  29 U.S.C. § 2617(a)(1)(A)(i)(I).  "If such renumeration was not denied, an employer may still be liable for 'any actual monetary losses sustained by the employee as a direct result of the violation ….'"  *Sons v. Henry Cnty.*, No. 1:05-CV-0516-DFH-TAB, 2006 WL 3135150, at *10 (S.D. Ind. Oct. 31, 2006) (quoting 29 U.S.C. § 2617(a)(1)(A)(i)(II)).  Equitable remedies, including "employment, reinstatement, and promotion," are also available under the FMLA.  29 U.S.C. § 2617(a)(1)(B).  However, "[t]he remedies available under the FMLA do not include emotional distress, consequential, punitive, or nominal damages."  *Tuhey v. Illinois Tool Works, Inc.*, No. 17 C 3313, 2017 WL 3278941, at *2 (N.D. Ill. Aug. 2, 2017) (collecting cases); *accord Sons*, 2006 WL 3135150, at *10.  Thus, unless Mr. Beaver can show his entitlement to compensatory damages or equitable relief under the FMLA, Defendants are entitled to summary judgment.  *See, e.g.*, *Hickey v. Protective Life Corp.*, 988 F.3d 380, 391 (7th Cir. 2021) (affirming summary judgment in favor of the defendant because the plaintiff had failed to show "any basis for monetary or equitable relief under § 2617" of the FMLA).

Mr. Beaver concedes that he suffered no loss of wages, salary, benefits, or other monetary damages as a direct result of any of the above claimed retaliatory actions.  He argues, however, that due to the retaliation that he was forced to endure, his workplace became intolerable, forcing him in November 2019 to agree to a transfer from his EAS-19 Labor Relations position to the EAS-16 Health and Resource Management position and then in May 2021 to decline a return to his former job as a Labor Relations Specialist because he feared further retaliation in the department.  Mr. Beaver claims the only reason he accepted the transfer and later declined to return to his EAS-19 position was to escape the harassment to which he had been subjected in Labor Relations and that his transfer was therefore a constructive demotion constituting an adverse employment action for purposes of his FMLA retaliation claim.  Although Mr. Beaver has not yet suffered any financial loss associated with the transfer—his salary remained the same when he transferred out of Labor Relations and then increased when the EAS-16 Health and Resource Management position was later reclassified to an EAS-17 Occupational Health Processing Specialist designation with an associated raise—he argues that he has a viable damages claim under the FMLA for future lost income because his current position has an $11,000 lower top-end salary than his former position in Labor Relations.  *See Trupp v. Roche Diagnostics Corp.*, 440 F. Supp. 3d 990, 1002 (S.D. Ind. 2020) (recognizing that "future lost wages" are recoverable under the FMLA).

In order to have a viable claim for damages under the FMLA, Mr. Beaver must therefore establish that the transfer he voluntarily accepted in November 2019 was in fact a constructive demotion.  A constructive demotion occurs "when an employer has made

18

conditions so unbearable that a reasonable person would have felt compelled to accept a demotion rather than remain in his current position." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013).  The framework for proving constructive demotion is the same as that used to prove constructive discharge.  *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 830 (7th Cir. 2014) (citing *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) ("A constructive demotion analysis should have the same structure as that for constructive discharge.")).  To make the requisite showing, the plaintiff must first establish "that his working conditions were so intolerable that a reasonable person would have been compelled to resign." *Simpson*, 196 F.3d at 877 (quotation marks and citation omitted).  Second, the plaintiff must show that his working conditions were "intolerable because of unlawful discrimination." *Id.*  This standard "is a higher bar than a hostile work environment." *Schneider v. United States Postal Serv.*, No. 16-cv-0013-bhl, 2022 WL 267903, at *9 (E.D. Wis. Jan. 28, 2022) (citing *Novak v. Nicholson*, 231 Fed. App'x 489, 493 (7th Cir. 2007)).  Thus, "unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997).

Here, even assuming that the actions taken against Mr. Beaver after he returned from FMLA leave arose out of retaliatory motives, he has failed to establish that he was subjected to the type of intolerable working conditions the Seventh Circuit law has required to establish constructive discharge or demotion.  As discussed above, Mr. Beaver alleges that upon his return from FMLA leave he was subjected to such actions as being reprimanded without reason, being unfairly asked to submit to an investigatory

interview, on two occasions being detailed to short-term work assignments away from the USPS's district office, and being forced to move from a large office with a window to one of the two smaller interior offices in the Labor Relations department that did not have a window.  These occurrences are not sufficiently severe to constitute working conditions "so onerous or demeaning" that he was compelled to accept a demotion.  *Cf. Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993) (exclusion from office activities, reprimands without reason, assignment to the least lucrative sales territories, no new account assignments, no supervisory duties, and no assistance by supervisor not sufficient for constructive discharge).

The informal reprimands Mr. Beaver was given by Mr. Leffler and Ms. Parrish as well as the investigatory interview Ms. Parrish conducted that resulted in no disciplinary action are the type of "minor annoyances" that the Seventh Circuit has found do not rise to the level even of adverse employment actions, much less unbearable working conditions.  Although Mr. Beaver's temporary work assignments no doubt caused him a certain level of inconvenience, it is undisputed that, as a Labor Relations Specialist, it was within the scope of his job responsibilities to be required occasionally to travel to other USPS locations to perform short-term duties.  We cannot, therefore, hold that Mr. Beaver's assignment to such temporary duties, even twice in close succession following his return from FMLA leave, was sufficient to have rendered his work conditions objectively unbearable.  Finally, while it may have been embarrassing to Mr. Beaver to have been moved to a smaller office without a window, he concedes that he was able to perform his job duties from that location.  Additionally, Mr. Beaver's office relocation

was not accompanied by any reduction in responsibility or other tangible or marginalizing job consequences as is typically required to rise to the level of a constructive discharge.  *See, e.g.*, *Parrett v. City of Connersville, Ind.*, 737 F.2d 690 (7th Cir. 1984) (constructive discharge established where former chief of detectives was demoted to uniform duty at a desk in a windowless room that had previously been a closet and assigned no work other than to "twiddle his thumbs in the closet").

Thus, even in considering all these slights together, Mr. Beaver's working conditions are far from the intolerable and unendurable conditions required under Seventh Circuit case law to support a finding of constructive demotion.  This is particularly true given that the string of allegedly retaliatory actions to which Mr. Beaver was subjected had ceased in early April 2019, approximately *seven months* before he was approached by Mr. Williams with the transfer proposal.  In sum, given the mild nature of the actions described as retaliation by Mr. Beaver to which he was subjected, coupled with the significant lapse in time between the last retaliatory act alleged to have occurred and his acceptance of the transfer offer, no reasonable employee in Mr. Beaver's position would have believed their working conditions so intolerable at the time of the transfer offer that they would have been compelled to accept a demotion.

Mr. Beaver has failed to establish that he was constructively demoted; thus, he has no viable damages claim under the FMLA.  For these same reasons, he cannot establish any entitlement to equitable relief under the statute.  In his complaint, Mr. Beaver generically requests equitable relief from Defendants, "including, but not limited to, employment, reinstatement and promotion."  Dkt. 1, ¶ 22.  However, because Mr.

Beaver's decision to accept the transfer was voluntary and unrelated to any activity

protected by the FMLA, the statute's remedial provisions are not applicable here.  *Cf.*

*Hickey*, 988 F.3d at 389 (holding that equitable relief not available under the FMLA

when the plaintiff's termination was unrelated to any activity protected by the statute).

Accordingly, without any basis to find that Defendants' alleged FMLA violation harmed

Mr. Beaver in any way remediable by the statute, Defendants are entitled to summary

judgment in their favor on his FMLA retaliation claim.

## III.    Conclusion

For the foregoing reasons, Plaintiff's Motions for Leave to Designate Previously

Unavailable Evidence in Opposition to Summary Judgment [Dkt. 62] and to

Amend/Correct Exhibit List [Dkt. 63] are <u>DENIED</u>.  Defendants' Motion for Summary

Judgment [Dkt. 49] is <u>GRANTED</u>.  All other pending motions are <u>DENIED AS MOOT</u>.

Final judgment shall be entered accordingly.

IT IS SO ORDERED.


Date:  6/10/2022

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

22

Distribution:

Clinton E. Blanck
BLANCK LEGAL, P.C.
cblanck@blancklegal.com

Lara K. Langeneckert
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
lara.langeneckert@usdoj.gov